IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| George Porterfield, #226071, ) | CIVIL ACTION NO. 9:12-1483-JMC-BM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| Dr. Moore, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

This action has been filed by the Plaintiff, pro se, pursuant to 42 U.S.C. § 1983. Plaintiff, an inmate with the South Carolina Department of Corrections (SCDC), alleges violations of his constitutional rights by the named Defendant.

The Defendant filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on December 20, 2012. As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on December 21, 2012, advising Plaintiff of the importance of a motion for summary judgment and of the need for him to file an adequate response. Plaintiff was specifically advised that if he failed to respond adequately, the Defendant's motion may be granted, thereby ending his case. Plaintiff thereafter filed a memorandum in opposition on January 22, 2013.

Defendant's motion is now before the Court for disposition.[1]



---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. The Defendant has filed a motion for summary judgment. As
(continued...)

**Background and Evidence**

Plaintiff alleges in his verified Complaint[2] that while he was incarcerated at the Broad River Correctional Institution (part of the SCDC system) in early 2010, a "Dr. Sampson" performed some x-rays on him due to complaints of arm, leg, neck, and feet pain with numbness, and recommended that Plaintiff see a specialist and that Plaintiff be given "medical shoes". Plaintiff further alleges, however, that the Defendant Dr. Moore "denied my seeing a specialist and the shoes".

Plaintiff alleges that he was transferred to the Perry Correctional Institution in March 2011, where he is still housed. Plaintiff alleges that while at PCI he has continued to experience pain and numbness in his neck, arm, legs and feet, but that he has still not been seen by a specialist as recommended by Dr. Sampson, or been provided "medical shoes". Plaintiff alleges that he continues to suffer severe pain and numbness, making walking, standing, and even sleeping difficult, but that Dr. Moore and the medical staff at PCI "only seem intent on medicating me and not giving me appropriate adequate treatment". Plaintiff requests immediate access to a medical "specialist", medical shoes, and monetary damages. See generally, Verified Complaint.

In support of summary judgment in the case, the Defendant Thomas Moore has submitted an affidavit wherein he attests that at the time of the matters alleged in the Complaint, he was the Medical Director for the Department of Corrections. Dr. Moore attests that it was his responsibility to decide if tests, referrals, and equipment ordered by primary care SCDC doctors were medically necessary. He never personally treated the Plaintiff. Moore attests that Plaintiff suffers

---

[1](...continued)
this is a dispositive motion this Report and Recommendation is entered for review by the Court.

[2]In this Circuit, verified complaints by pro se litigants are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

2



from numerous medical and mental health problems, including but not limited to depression, paranoid schizophrenia, anti-personality disorder, high blood pressure, allergic rhinitis, arthritis, hepatitis C, Gerd, achilleas tendinitis, plantar fascilitis, degenerative disc disease, degenerative joint disease, and cervical spondylosis with right arm pain. Moore attests that on December 17, 2009, Plaintiff presented to the Broad River medical office complaining that his right arm had felt numb for two months. Dr. Moore attests that at that time Plaintiff was working in the cafeteria seven hours per day. Plaintiff's physical examination was within normal limits, and the nurse referred the matter to the doctor. See also, Defendant's Exhibit B [Plaintiff's Medical Records], Encounter # 36.

On March 2, 2010, Plaintiff complained about his right arm being numb from his neck to his fingertips for a couple of months. Plaintiff had fallen on the basketball court and landed on his right side, after which the numbness worsened and his elbow hurt. A physical examination at that time revealed that Plaintiff's handgrips were unequal, and the elbow was warm and painful to the touch. The nurse again referred Plaintiff to the doctor. See also, Id., Encounter # 42. Plaintiff thereafter presented to the doctor's clinic for a followup evaluation on March 9, 2010. However, at that time Plaintiff stated that his elbow was fine, although he now complained that he had felt numbness in his neck and right arm descending into his hand for approximately six months, starting before his incarceration. Plaintiff also complained of episodic pain in his feet for the past several months. Moore attests that the physician conducted a thorough physical examination, which was within normal limits with the exception that Plaintiff's feet had mild pes planus with plantar fascilitis and shallow callus. Lab work was ordered and Plaintiff was provided Motrin for pain, with a referral to receive special foot insoles. See also, Id., Encounter # 47. Plaintiff received the prescribed shoe insoles/arch cushions on March 26, 2010. Id., Encounter # 55.



Moores attests that Plaintiff presented to the medical office again on May 25, 2010, complaining of numbness in his right shoulder down through to all of his fingers for the past three months. Plaintiff was examined by the Nurse, who then referred the matter to the Doctor. The Doctor reviewed Plaintiff's chart and noted that his examination of March 9, 2010 was within normal limits. Id., Encounter # 77.

On July 6, 2010, Plaintiff again complained about pain in his right arm to the fingertips, and he was examined by the Nurse who made an appointment for Plaintiff to see the Doctor. Id., Encounter # 85. Plaintiff was thereafter examined by the Doctor on July 19, 2010. The physician noted that Plaintiff described "vague" complaints of episodic tingling and numbness in his arm and fingers, even though he was performing his job in the cafeteria without difficulty. Plaintiff was continued on Motrin, and the Doctor ordered x-rays of the C spine and right shoulder to rule out degenerative joint disease and radiculopathy. Id., Encounter # 87. X-rays were thereafter performed on August 10, 2010, with the x-ray of the right shoulder being normal and the x-ray of the cervical spine showing spondylosis C5 - T1 with degenerative disc disease at C5 - C7. See also, Defendant's Exhibit C. Moore attests that these are common findings for a man of Plaintiff's age (early 50s).

Moore attests that on September 14, 2010 Plaintiff complained that his right arm kept going numb. Plaintiff was examined by a nurse, who noted that Plaintiff had good hand grip with quick capillary refill. Plaintiff's range of motion of the right arm was within normal limits and without pain. Id., Encounter # 102. Plaintiff returned to the medical office the following week with continued complaints about his right arm going numb. The nurse examined Plaintiff and again noted that he had range of motion to the right arm without difficulty. Hand grips were also equal, although Plaintiff had muscle spasms in the neck and right shoulder. Moore attests that the Nurse



implemented a standing order of Ibuprofen, back exercises, and heat on the involved areas. Id., Encounter # 103.

Moore attests that Plaintiff was examined by a Nurse again on October 19, 2010 for continued complaints of right should/arm numbness and pain. On examination, the right shoulder and arm had good range of motion, capillary refill, and pulses, and Plaintiff was provided with Motrin together with instructions to use moist heat to the neck and shoulder. The Nurse also referred the matter to the Doctor. Id., Encounter # 108. Plaintiff was seen by the physician on November 10, 2010, at which time his physical examination was again within normal limits. The Doctor ordered another x-ray of the C spine and right shoulder to rule out degenerative joint disease, the results of which were a normal right shoulder x-ray and a cervical spine x-ray which showed degenerative cervical spondylosis with degenerative disc disease, especially at C5 - 6, C6 - 7 and C7 - T1. Id., Encounter # 114; see also Defendant's Exhibit D. Moore attests that these are common findings for a man of Plaintiff's age. On January 6, 2011 a Doctor discussed Plaintiff's degenerative joint disease with him and advised him to continue taking Motrin as ordered. Id., Encounter # 121.

On January 25, 2011, Plaintiff was evaluated by the physician for complaints of episodic spontaneous numbness to the right arm and numbness/tingling to his feet. The physician requested approval of a nerve conduction study and EMG of the right arm. Id., Encounter # 127. On February 14, 2011, Plaintiff requested Neurontin. This request was sent to the Doctor for review. Id., Encounter # 131. On February 24, 2011, Plaintiff again requested Neurontin. He was examined by the Nurse, and his medication request was sent to the Doctor for consideration. Id., Encounter # 55.

On March 17, 2011, Plaintiff was again examined by the Nurse for complaints about



his arm, shoulder and feet, following which the matter was referred to the Doctor. Id., Encounter # 138. Plaintiff was thereafter examined by the physician on March 22, 2011, at which time the Doctor reordered the EMG and NVC tests of the right arm and lower extremities. Id., Encounter # 140. Plaintiff was thereafter transferred to the Perry Correctional Institution, following which he presented to the medical office on March 25, 2011. The Nurse noted that his physical examination at that time was normal. Plaintiff was instructed to continue taking Ibuprofen, and the matter was referred to the Nurse Practitioner. Id., Encounter # 143. Plaintiff was examined by the Nurse Practitioner on March 28, 2011, who noted that the consult for the test had been sent for approval. Id., Encounter # 145. However, Moore attests that he denied the request for the EMG and NVC test.

Moore attests that Plaintiff presented to the Nurse Practitioner again on April 18, 2011, complaining of bilateral foot pain. At the time he was wearing boots with insoles. The Nurse Practitioner diagnosed pes planus and ordered x-rays of the feet. Id., Encounter # 155. Following complaints on May 12, 2011 about numbness and pain in his neck, arm, hand, and feet, Plaintiff had a physical examination that was within normal limits. The matter was referred to the Doctor. Id., Encounter # 160. X-rays of Plaintiff's left foot on May 16, 2011 showed questionable mild hallux valgus (angulation of the great toe toward the other toes), while an x-ray of the right foot showed mild hallux valgus. See Defendant's Exhibit E.

On May 18, 2011 Plaintiff complained about numbness of the right arm and hand for about one year. Plaintiff was examined by the Nurse Practitioner, who noted that Plaintiff's x-ray showed degenerative disc disease to the C-spine. She ordered a consult for NCV and EMG test of the right arm. Id., Encounter # 162. On June 9, 2011, Plaintiff complained of pain in both legs and that he wanted orthopedic shoes. The matter was referred to the Nurse Practitioner. Id., Encounter



# 172.  The Nurse Practitioner thereafter saw Plaintiff on July 11, 2011, and the Nurse Practitioner ordered a consult for approval of new shoes.  Id., Encounter # 178.  The Nurse Practitioner saw Plaintiff again on August 30, 2011 for complaints of foot pain that was causing the pain to go into the neck.  However, a physical examination at that time was again normal, and it was noted that Plaintiff was wearing black boots.  The Nurse Practitioner indicated that Plaintiff had mild hallux valgus and pes planus.  Id., Encounter # 201.  Plaintiff was examined by a Nurse on September 9, 2011, with the physical examination again being within normal limits.  The matter was referred to the Nurse Practitioner for any further treatment recommendations.  Id., Encounter # 205.

Moore attests that he denied the consult for converse shoes and the consult for EMC/NCV tests on September 12, 2011.  On September 16, 2011, Plaintiff again complained about his right arm, shoulder, neck and fingertips.  However, a physical examination by the Nurse Practitioner was again within normal limits.  The matter was referred to the Doctor.  Id., Encounter # 212.  Plaintiff then presented back to the medical office on September 23, 2011, wanting to see his medical records and to get new shoe inserts.  The Nurse reviewed Plaintiff's records with him and discussed his x-ray findings, and otherwise referred the matter to the Nurse Practitioner, who wanted to discuss them with the Doctor.  Id., Encounter # 215.

Plaintiff was evaluated by the Doctor again on November 3, 2011, at which time it was noted that Plaintiff was working in recreation.  The Doctor noted that Plaintiff had cervical spondylosis and fascilitis, and ordered a consult for insoles.  Id., Encounter # 241, Moore attests that he approved the insoles with arch support on November 9, 2011, and that Plaintiff received his arch cushions that same date.  Id., Encounter # 246.

Moore attests that Plaintiff did not complain about his neck, shoulder, arm and feet



problems again until January 12, 2012, when he presented to the medical office stating that his feet, right shoulder and arm got numb when he lay down, and that it felt like pins and needles. The Nurse referred the matter to the Doctor. Id., Encounter # 286. The Doctor thereafter examined the Plaintiff on January 17, 2012, and explained the degenerative joint disease and degenerative disc disease process to the Plaintiff. The Doctor also ordered new medication. Id., Encounter # 288.

On February 16, 2012, the Plaintiff complained that his medications were not working. The Nurse noted that Plaintiff's physical examination was within normal limits, and she referred the matter to the Doctor. Id., Encounter # 302. The Plaintiff then saw the Doctor on March 13, 2012 for followup of his neck and right arm pain. The Plaintiff still wanted new shoes. The Doctor explained the shoe policy and also ordered new medication. Id., Encounter # 313. Moore attests that on April 4, 2012, Plaintiff came to the medical office to review his medical records, looking for the consult for orthopedic shoes that he [Moore] had disapproved. Id., Encounter # 324. Moore attests that Plaintiff did not thereafter complain about his neck, shoulder, arm and feet problems until August 23, 2012, when he presented to the medical office complaining of numbness on his right side for over a year. Plaintiff was examined by the Nurse, who referred the matter to the Doctor with a note that he suspected Plaintiff of malingering. Id., Encounter # 361.

Moore attests that Plaintiff's examinations and x-rays have revealed that Plaintiff suffers from cervical spondylosis, degenerative joint disease, degenerative disc disease, and hallux valgus, none of which are serious or life threatening problems. Moore further attests that the medical records show that Plaintiff's activities of daily living are not impaired by these medical conditions or by his complaints, and that because of Plaintiff's physical examinations and x-ray findings, he concluded that EMG and NCV tests were not medically necessary. Moore attests that he did approve



the consults for insoles and arch supports, which helped Plaintiff's problems and which he continues to use. Moore attests that Plaintiff was also treated with medications (as is also shown in the attached medical records).

Moore attests that Plaintiff received and continues to receive care and treatment for his complaints, that he has not experienced any serious or life threatening medical problems regarding these physical complaints, nor has he had any emergent or urgent medical problems caused by his physical condition that required immediate or emergency care. Moore attests that Plaintiff's problems have been timely evaluated and appropriately treated, and that other than his decisions regarding the EMG and NCV tests (denied), all of Plaintiff's medical treatment is provided by other SCDC health care staff. See generally, Moore Affidavit, with attached Exhibits.

As attachments to his memorandum in opposition to the motion for summary judgment, Plaintiff has attached copies of Defendant's Exhibits C - E (Radiology Reports).

**Discussion**

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this showing, however, the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial. Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see

9



Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. Weller v. Dep't of Social Services, 901 F.2d 387 (4th Cir. 1990). Here, after careful review and consideration of the arguments and evidence presented, the undersigned finds and concludes that the Defendant is entitled to summary judgment in this case.

In order to proceed with a claim for denial of medical care as a *constitutional violation*, Plaintiff must present evidence sufficient to create a genuine issue of fact as to whether the Defendant was deliberately indifferent to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Farmer v. Brennen, 511 U.S. 825, 837 (1994); Sosebee v. Murphy, 797 F.2d 179 (4th Cir. 1986); Wester v. Jones, 554 F.2d 1285 (4th Cir. 1977); Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975); Belcher v. Oliver, 898 F.2d 32 (4th Cir. 1990). Plaintiff has failed to submit any such evidence. Rather, the evidence before this Court shows that Plaintiff has received continuous and ongoing treatment for his medical complaints. Plaintiff has been regularly seen (not just for the medical complaints alleged in this lawsuit, but for various other medical problems as well) by nurses, nurse practitioners, and doctors. He has also received x-rays and radiology reports, the results of which were discussed with him. None of the medical evidence provided to this Court shows that the Defendant, or any other medical personnel, was deliberately indifferent to Plaintiff's serious medical needs. Levy v. State of Ill. Dept. of Corrections, No. 96-4705, 1997 WL 112833 (N.D.Ill. March 11, 1997) ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"], quoting Farmer, 511 U.S. at 837; House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993) [Plaintiff's conclusory allegations insufficient to



maintain claim].

Plaintiff's complaints concerning this Defendant revolve around his refusal to order special shoes for Plaintiff to wear or to have the particular studies performed that Plaintiff wanted. This is not a basis for a deliberate indifference claim. The record reflects that Dr. Moore did order some special footwear for the Plaintiff; however, he is not required to order or approve any special medical treatment, studies or examinations referred to him for consult or as desired by the Plaintiff. Rather, as a medical professional Dr. Moore was entitled to evaluate Plaintiff's condition and render a judgment as to the type of care and treatment warranted. See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985)[Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim absent exceptional circumstances]; Scheckells v. Goord, 423 F.Supp. 2d 342, 348 (S.D.N.Y. 2006) (citing O'Connor v. Pierson, 426 F.3d 187, 202 (2d Cir. 2005) ["Lay people are not qualified to determine...medical fitness, whether physical or mental; that is what independent medical experts are for."]). Further, with respect to the remainder of the medical care Plaintiff received from the various nurses, nurse practitioners, and physicians at the prison, Dr. Moore was entitled to rely on the judgment of these other medical professionals who saw Plaintiff on a regular basis. Cf. Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995) [officials entitled to rely on judgment of medical personnel]; Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990) [officials entitled to rely on expertise of medical personnel].

While Plaintiff may not agree with the extent and nature of the medical care he received, he cannot simply allege in a conclusory fashion that he did not receive constitutionally adequate medical care or attention, otherwise provide no supporting evidence, and expect to survive summary judgment, particularly when the Defendant has submitted medical documents and evidence,

11



supported by a professional medical opinion, which refute Plaintiff's claims. Green v. Senkowski, 100 Fed.Appx. 45 (2d Cir. 2004) (unpublished opinion) [finding that plaintiff's self-diagnosis without any medical evidence insufficient to defeat summary judgment on deliberate indifference claim]; Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987) ["Even though pro se litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]; Levy, No. 96-4705, 1997 WL 112833 ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"].

Plaintiff may, of course, pursue a claim in state court if he believes that the medical care provided to him constitutes malpractice. However, that is not the issue before this Court. Estelle v. Gamble, 429 U.S. 97, 106 (1976)["medical malpractice does not become a constitutional violation merely because the victim is a prisoner."]. The evidence before the Court is insufficient to raise a genuine issue of fact as to whether the named Defendant was deliberately indifferent to Plaintiff's serious medical needs, the standard for a constitutional claim, and Plaintiff's federal § 1983 medical claim should therefore be dismissed. See DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 200-203 (1989) [§ 1983 does not impose liability for violations of duties of care arising under state law]; Baker v. McClellan, 443 U.S. 137, 146 (1976) [§ 1983 claim does not lie for violation of state law duty of care]; Estelle, 429 U.S. at 106 ["medical malpractice does not become a constitutional violation merely because the victim is a prisoner."].

## Conclusion

Based on the foregoing, it is recommended that the Defendant's motion for summary judgment be **granted**, and that this case be **dismissed**.



The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

February 14, 2013
Charleston, South Carolina



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail. Fed. R. Civ. P. 6(a) & (e). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

> Larry W. Propes, Clerk
> United States District Court
> Post Office Box 835
> Charleston, South Carolina 29401

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).

14

